**FOURTH DIVISION
DILLARD, P. J.,
BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 2, 2024**

# In the Court of Appeals of Georgia

A24A0660. SMITH v. THE STATE.

PADGETT, Judge.

A jury found Selworth Smith ("appellant") guilty of one count of aggravated assault - family violence and one count of simple battery - family violence. Appellant seeks review of the denial of his motion for new trial, arguing that the trial court erred in admitting certain evidence during the trial, and in denying appellant's motion for discharge and acquittal. Further, appellant argues that he was denied effective assistance of counsel.[1] For the reasons set forth herein, we disagree and affirm.

---

[1] Appellant also claims error relating to the revocation of the probated portion of the sentence that was imposed in this case. The revocation hearing was conducted on the same date of the hearing on his motion for new trial and, after hearing the evidence presented, the trial judge revoked probation prior to appellant's motion for new trial being decided. However, no timely application for discretionary appeal was filed by appellant as required under OCGA § 5-6-35 (a) (5) and (d) relating to the

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (99 Sct 2781, 61 LEd2d 560) (1979).

*Padilla-Garcia v. State*, 372 Ga. App. 9, 9 (903 SE2d 680) (2024) (citations omitted).

So viewed, the evidence shows that Tabitha Williams-Murdock ("Tabitha") was married to Mark Murdock ("Murdock") and they shared a residence on Riley Road. While married to Murdock, Tabitha began operating a group home where she met appellant. Initially, Tabitha and appellant were merely friends but eventually became involved in an on-again, off-again romantic relationship. At times, appellant would reside in the Riley Road residence with Tabitha and Murdock - sometimes as a tenant who paid rent and, at other times, as a guest for extended periods of time.

On the evening of October 31, 2018 and extending into the early morning hours of November 1, 2018, appellant was at the Riley Road residence. Also present in the

probation revocation matter. Therefore, issues relating to the revocation of appellant's probation are not properly before this court and are not considered herein.

home were Tabitha, Murdock, Tabitha's adult son, and Tabitha's adult brother. Tabitha and appellant went to the liquor store to purchase some alcohol just before the store closed for the evening. On the way back to the residence, Tabitha and appellant began arguing which resulted in appellant breaking the bottle of alcohol that Tabitha had just purchased once they returned to the garage of the Riley Road residence. When the two entered the residence, Tabitha's brother was upstairs, her son was in a guest room and Murdock was dozing on the couch in the living room. Tabitha sat down at the dining room table and began listening to music on a small portable speaker.

The argument between Tabitha and appellant intensified after they had been in the residence for a short time. Appellant then took the portable speaker from the table and hit Tabitha with it by slamming it into her head. Tabitha cried out to Murdock, telling Murdock that appellant had just struck her in the head. Murdock began to rise from the couch and picked up a two-by-four wooden board that was near him. Appellant saw Murdock beginning to rise from the couch with the board and rushed toward Murdock. Appellant was able to wrestle the board away from Murdock

3

and used the board to strike Murdock in the head several times. Murdock yelled out for Tabitha to call 911 but was otherwise rendered unconscious or incoherent.

As the altercation between Murdock and appellant began, Tabitha retrieved her son, and retreated to a back bedroom where she locked and barricaded the door. Once safely in the back bedroom, Tabitha began calling family members and 911. When law enforcement officers arrived at the Riley Road residence, there was initially no response to their knocking on the door. Officers made forceful entry after looking through the window and seeing Murdock laying on the floor with substantial amounts of blood pooling around him. Once officers gained entry, they gathered everyone in the home and escorted them from the residence so that EMS personnel could enter and begin treating Murdock. Appellant was not located within the residence at the time the officers entered. The officers and EMS personnel all saw what they described as a wooden board generally near the location where Murdock fell.

Murdock was transported to a hospital where he received 18 total stitches to his head. Law enforcement officers continued their investigation by taking all of the other occupants to their station to be further interviewed by investigators. When officers transported the other occupants of the home back to the Riley Road residence a few

hours later, they were asked by Tabitha to again search the home and ensure that appellant was not there. Upon the secondary search, officers found appellant hiding under a blanket in the upstairs bonus room of the home. Appellant was taken into custody at that time.

Appellant was indicted for aggravated assault - family violence for striking Murdock with the wooden board. He was also indicted for simple battery - family violence for striking Tabitha with the portable speaker. After a trial, a jury found appellant guilty of both offenses.

*I. 404 (b) Evidence*

Prior to trial, the State filed several different notices of intent to introduce evidence under OCGA § 24-4-404 (b). The State provided several different notices that put the appellant on notice of dozens of different offenses or events. The trial court heard the motion just prior to trial based upon the State's "Supplemental Notice" that listed nine prior acts. As noted by the trial court in her written order on the issue and as reflected in the trial transcript, the State elected to proceed on six such incidents. The trial court found that three of the incidents were inadmissible

under Rule 404 (b) but allowed three of the incidents to be admitted. Appellant complains on appeal about only one of the allowed extrinsic acts.

Appellant argues on appeal that the trial court erred in allowing an extrinsic act that occurred in January 2014. In that case, a different victim who was not involved with the instant case, J. B., testified that she and appellant dated for a short time in 2013 - 2014. They eventually moved in together. On the date in question, appellant became irrational and told J. B. she was not allowed to leave her room. She eventually had to use the restroom and as she was exiting the restroom, appellant confronted her. He pressed her head into a bathroom mirror and punched her in the face. Appellant then pushed J. B. into a bedroom and got on top of her, attempting to suffocate her with a pillow. Appellant eventually removed the pillow and got off of J. B. After appellant completed the assault against J. B., he forced her to sit on a couch and not move while he napped, waking occasionally to ensure that J. B. had not moved. J. B. was eventually able to reach law enforcement by phone. Officers responded and arrested appellant. Appellant was convicted via a plea agreement of the offense of battery against J. B. When this evidence was presented to the jury at trial, the trial

court gave the jury a limiting instruction prior to J. B. taking the stand, informing the jury of the limited purpose for which they were to consider the evidence from J. B.[2]

To have evidence of other acts be deemed admissible under OCGA § 24-4-404 (b), the State is required to establish that

> (1) the evidence of extrinsic, or other, acts is relevant to an issue other than the defendant's character, (2) the probative value of the other acts evidence is not substantially outweighed by the danger of unfair prejudice as required by Rule 403, and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the prior act in question.

*Wright v. State*, 362 Ga. App. 867, 877 (2) (870 SE2d 484) (2022) (citation and punctuation omitted). "[We] review the admission of Rule 404 (b) evidence and the proper application of the Rule 403 balancing test for abuse of discretion, and the trial court's decision will not be disturbed unless there is a clear abuse of discretion." *Jones v. State*, 301 Ga. 544, 548 (2) (802 SE2d 234) (2017). With these principles in mind, we turn to appellant's arguments.

---

[2] As noted in *Jernigan v. State*, 357 Ga. App. 415, 426 (2) (a) (ii) (848 SE2d 707) (2020), the proper use of a limiting instruction in connection with any evidence admitted under Rule 404 (b) reduces the "risk of any unfair prejudice resulting from the admission of" extrinsic evidence.

Appellant makes no argument to suggest that admission of the extrinsic evidence was improper under the third prong. The State admitted certified copies of convictions for all of the extrinsic acts and appellant has not argued before the trial court or this court that the State failed to establish that he was the perpetrator of the extrinsic offenses. Therefore, we will focus our analysis on the first two prongs of the Rule 404 (b) test. *See Hood v. State*, 309 Ga. 493, 499 (2) (847 SE2d 172) (2020) ("[Appellant] does not argue that the State failed to meet its burden on the third part of the test; thus, we address only the first and second parts").

The State offered the evidence relating to the January 2014 incident to prove intent.[3] The first prong of the test for admissibility relates to relevancy as defined under OCGA § 24-4-401. This prong involves a "binary question - evidence is either relevant or it is not." *Wright v. State*, 362 Ga. App. 867, 877 ) (2) (870 SE2d 484) (2022) (citation and punctuation omitted). Where extrinsic evidence is offered to prove intent, "its relevance is determined by comparing the defendant's state of mind

---

[3] The State argued that the evidence went to motive. However, the trial court found that the evidence was admissible to prove intent. In the written order denying appellant's motion for new trial, the trial court noted that the January 2014 incident was admitted to establish motive. However, because the trial court initially found that the evidence was admissible to establish intent, we will examine the evidence on that basis.

in perpetrating both the extrinsic and charged offenses. Thus, where the state of mind required for the charged and extrinsic offense is the same, the first prong of the Rule 404 (b) test is satisfied." *McMillan v. State*, 357 Ga. App. 344, 348-349 (850 SE2d 779) (2020).

Appellant was charged with both aggravated assault - family violence against Murdock and battery - family violence against Tabitha in the present case. The state of mind for battery as committed in the extrinsic act involving J. B. and that for which he was on trial involving Tabitha was identical. Thus, the first prong was satisfied.

The second prong is essentially the application of OCGA § 24-4-403 to the extrinsic evidence of other acts. The second prong requires the trial court to "undertake in each case a considered evaluation of the proffered justification for the admission of such evidence and make an independent determination of whether the probative value of the evidence is substantially outweighed by any of the Rule 403 factors." *Wright*, 362 Ga. App. at 877 (citation and punctuation omitted). "Factors to be considered in determining the probative value of other act evidence offered to prove intent include its overall similarity to the charged crime, its temporal remoteness, and the prosecutorial need for it." *Hood*, 309 Ga. at 501 (citation and

punctuation omitted). While the first prong of the test for admissibility involves a binary concept, the second prong is more subjective and whether the State meets its obligations under the second prong depends a great deal on the facts of the case. "[T]here is no mechanical solution for this balancing test." *State v. Jones*, 297 Ga. 156, 163 (3) (773 SE2d 170) (2015).

As to the second prong of the Rule 404 (b) test, the trial court was authorized to find that the probative value of the extrinsic evidence was not substantially outweighed by the danger of unfair prejudice. Rule 403 is an extraordinary remedy which should be used only sparingly. *McMillan v. State*, 357 Ga. App. at 350 (citation and punctuation omitted). Even in connection with an analysis under Rule 404 (b), when determining whether the evidence should be excluded under the second prong, "we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial effect." Id. "In weighing the probative value of other acts evidence, a court may consider a number of factors, including (1) prosecutorial need, (2) overall similarity of the other acts and the acts charged, and (3) the temporal remoteness of the other acts." *Wright*, 361 Ga. App. at 877 (2) (citation and punctuation omitted).

10

In applying these principles to the facts of this case, the trial court found that appellant had placed intent in issue by entering a plea of not guilty to the charged offenses. *Hood*, 309 Ga. at 499. The trial court also noted that the evidence, at least as to certain elements of the charged charges, was circumstantial. Further, the trial court noted that even the State acknowledged that Tabitha had previously lied to law enforcement witnesses who ultimately testified in this case. The trial court also found that the prosecutorial need for the extrinsic evidence was much higher in this case, given the protracted history between appellant and the victims in this case as documented by the law enforcement officer who testified as a witness for appellant.

Appellant would have us find that dissimilarities between the charged offenses and the extrinsic evidence and that the passage of four years between the extrinsic act and the charged crimes should be determinative. Further, appellant urges us to find that because other extrinsic acts were properly admitted, that the need for the January 2014 incident was reduced. However, as noted previously, the second prong does not lend itself to mechanical application. Tabitha's credibility was a critical issue in the case, particularly in light of the fact that appellant called a law enforcement witness to testify that Tabitha had previously falsely reported a crime and that she had no

credibility with the officer. The January 2014 incident was the only extrinsic act offered which involved a victim who did not reside in the Riley Road residence. The analysis under the second prong must involve a case-specific analysis and we cannot say that the trial court abused its discretion in finding that the probative value of the January 2014 extrinsic act was not substantially outweighed by the danger of unfair prejudice under the facts of this case.

*II. Speedy trial issues*

Appellant next argues that the trial court erred in denying his motion for discharge and acquittal based upon constitutional speedy trial principles. The trial court heard appellant's motion and denied the same via a written order. Appellant argues that the trial court erred in denying his motions for discharge and acquittal based upon constitutional speedy trial principles but we disagree.

"The United States Constitution guarantees that, '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial,' U.S. Const. Amend. VI. Likewise, the Georgia Constitution protects this same right '[i]n criminal cases, the defendant shall have a public and speedy trial[.]' Ga. Const. of

1983, Art. I, Sec. I, Par. XI (a)." *Henderson v. State*, 310 Ga. 231, 234 (2) (850 SE2d 152) (2020).

> A constitutional speedy-trial claim is evaluated under the two-part framework set out in *Barker v. Wingo*, 407 U. S. 514 (92 SCt 2182, 33 LEd2d 101) (1972). First, the trial court must consider whether the length of time between the defendant's arrest and trial is sufficiently long to be considered presumptively prejudicial. If not, the speedy-trial claim fails at the threshold. A delay of one year or more is typically presumed to be prejudicial. . . .When that threshold is crossed, the trial court proceeds to the second part of the framework, applying a context-focused, four-factor balancing test to determine whether the defendant was denied the right to a speedy trial. These four factors are (1) the length of the delay; (2) the reasons for it; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant.

*Myers v. State*, 370 Ga. App. 643, 645 (2) (898 SE2d 834) (2024) (citations and punctuation omitted). This court must evaluate the case under the tests established in *Barker* and *Doggett v. United States*, 505 U.S. 647 (112 SCt 2686, 120 LEd2d 520) (1992).

> Application of this test 'is committed principally to the discretion of the trial court, and this Court has a limited role in reviewing the trial court's decision.' '[W]e must accept the factual findings of the trial court unless

13

they are clearly erroneous, and we must accept the ultimate conclusion of the trial court unless it amounts to an abuse of discretion[.]'

*Labbee v. State*, 362 Ga. App. 558, 561 (869 SE2d 520) (2022) (citation and punctuation omitted).

*a. Threshold inquiry - presumptive prejudice*

"Speedy trial rights attach at the time of arrest or formal arraignment, whichever is earlier." *Labbee*, 362 Ga. App. at 562 (citation omitted). Appellant was arrested on November 2, 2018. The trial court heard appellant's motions for discharge and acquittal on October 21, 2020. There were approximately 23 months and two weeks between the date of appellant's arrest and the hearing on his motions. Given that a one year delay is typically presumed to be prejudicial in this context and the State concedes that the delay was presumptively prejudicial, we find that there was presumptive prejudice in this case. See *Goins v. State*, 306 Ga. 55, 57 (2) (b) (829 SE2d 89) (2019) (citation and punctuation omitted). We must now turn to the second step in the *Barker-Doggett* analysis.

*b. Barker-Doggett balancing test*

There are four considerations that must be included in the second stage of the *Barker-Doggett* analysis. "No one factor is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.'" *Ruffin v. State*, 284 Ga. 52, 55 (2) (b) (663 SE2d 189) (2008) (citation omitted). Additionally, the four factors identified by *Barker*, *Doggett*, and their progeny do not represent an exhaustive list of factors to be considered – "they 'have no talismanic qualities' and 'must be considered together with such other circumstances as may be relevant' given the animating principles behind the speedy trial guarantee." *Ruffin*, 284 Ga. at 56 (2) (citation omitted). Instead of relying upon some mathematic formula, courts are charged with the task of engaging in a "difficult and sensitive balancing process" which demands that speedy trial cases be approached individually, based on the facts of that particular case. Id.

> [T]he four factors that form the core of the constitutional speedy trial balancing test are: (i) whether delay before trial was uncommonly long, (ii) whether the government or the criminal defendant is more to blame for that delay, (iii) whether, in due course, the defendant asserted the right to a speedy trial, and (iv) whether he or she suffered prejudice as the delay's result.

*Shriver v. State*, 371 Ga. App. 580, 583 (901 SE2d 721) (2024) (citation omitted). As part of this analysis under the second prong, "[d]eliberate delay is weighed heavily against the State. Delay resulting from 'neutral' causes, such as negligence, has lighter weight. Of course, delay caused by the defense weighs against the defendant." *Sosniak v. State*, 292 Ga. 35, 41 (3) (734 SE2d 362) (2012) (citation omitted).

*i. Length of delay and cause of the delay*

The trial court found that the delay in appellant's case being tried consisted of two different, identifiable periods of time. The trial court found that the delay that occurred between the date of appellant's arrest and March 13, 2020 was "non-intentional routine delay in reaching the case in terms which is attributable to crowded dockets competing for the limited trial dates." The trial court attributed that delay to the State but only lightly, a finding which we deem appropriate. See *Labbee*, 362 Ga. App. at 563. There was no credible evidence presented and no arguments made that the initial delay was the product of intentional acts by the State.[4] However, the

---

[4] During the time that appellant was self-represented, he argued to the trial court that the State delayed the case to create a victim; an allegation the trial court properly found to be nonsensical as identifiable victims were identified in the initial arrest warrants issued for appellant's arrest. Appellant also argued that the State delayed producing discovery but the trial court found that the State produced discovery responses within eight days of a discovery request being filed by appellant's

ultimate responsibility to bring an accused person to trial lies with the government. "Although this type of unintentional delay is relatively neutral or benign, it still must be weighted against the [S]tate." *Thomas v. State*, 296 Ga. App. 231, 235 (2) (b) (674 SE2d 96) (2009) (citation omitted).

Between March 13, 2020 and extending into 2021, Georgia was in the peak of the ramifications of the COVID-19 pandemic. The judicial emergency orders issued by the Chief Justice of the Georgia Supreme Court effectively banned jury trials throughout Georgia, beginning in March 2020 and fully ending on June 30, 2021.[5] See *Foreman v. State*, 371 Ga. App. 838, 840 n.6 (903 SE2d 303) (2024). This period of time was the second identifiable period cited by the trial court in its analysis. In regard to the delay caused by the pandemic and related judicial emergency orders, the trial court found that those delays were caused by the government but found that it was

---

prior counsel. Therefore, there was no credible argument presented to suggest that any delay in this case was the product of the State's attempt to gain a tactical advantage.

[5] "On March 14, 2020, . . . citing the public health emergency presented by the COVID-19 pandemic, Supreme Court of Georgia Chief Justice Harold Melton issued an order declaring a statewide judicial emergency." *Copeland v. Copeland*, 361 Ga. App. 125, 127, n. 3 (863 SE2d 509) (2021). "The judicial emergency order, among other things, suspended jury trials that had not yet commenced" and "thereafter was extended several times with modifications." *Labbee*, 362 Ga. App. at 560.

lightly attributable to the State. While we agree that the "State" in this regard includes all governmental actors, to include both prosecutors and courts, a pandemic is a "catastrophic and unique event beyond either party's control." *Labbe*, 362 Ga. App. at 566 (citation omitted). Neither party is responsible for the delays caused by the COVID-19 pandemic. There are some delays which are not attributable to either party and appellant has not identified any evidence to suggest that jury trials in Douglas County could have resumed more quickly than they were or that the judicial emergency declaration was inappropriate. See *Labbee*, 362 Ga. App. at 566. While the trial court found that the delay that occurred during the existence of the judicial emergency was lightly attributable to the State, we find our analysis announced in *Labbee* to be more persuasive; delay during the judicial emergency declared during the COVID-19 pandemic should be considered a neutral factor under the *Barker-Doggett* framework, not weighted against either party. *State v. Adams*, 364 Ga. App. 864, 868 (2) (b) (i) (876 SE2d 719) (2022) (citation omitted).

The trial court also properly rejected the State's arguments relating to any delay being attributable to the dozens of motions filed by appellant, both while he was represented by counsel and during a period of time that he was self-represented. The

trial court found that the majority of those motions were addressed summarily by the trial court without the necessity of a hearing and that the filing of those motions did not delay the proceedings.

Under the facts of this case, we will not disturb the trial court's findings relative to these first two factors only lightly being charged against the State. See *Shriver*, 371 Ga. App. at 585.

*ii. Assertion of the right*

Next, the *Barker-Doggett* analysis requires us to consider whether appellant timely asserted his constitutional right to a speedy trial. Just over one year after he was indicted, appellant filed a document he entitled as a motion to dismiss indictment in which he asserted that he had been denied his constitutional right to a speedy trial. At the time this document was filed, appellant was represented by counsel. Approximately six weeks later, while continuing to be represented by counsel, appellant filed a second motion seeking to dismiss the indictment based upon an alleged violation of his constitutional right to a speedy trial. The trial court dismissed both of these motions, finding that they were filed by appellant while he continued to be represented by counsel and that the court would not consider those motions filed

19

by a represented party.[6] Counsel was allowed to withdraw a few weeks later. Appellant then filed another series of motions to dismiss wherein he alleged violations of his constitutional right to a speedy trial. The trial court conducted a hearing on that motion and denied the same.

During the period of time that appellant was self-represented, he also filed what purported to be a motion for a speedy trial on statutory grounds. The trial court dismissed that motion as it was not filed during the term of court in which the case was indicted or the following term as required by OCGA § 17-7-170.[7]

Appellant was arrested on November 2, 2018 and was indicted on January 4, 2019. He was arraigned on February 11, 2019. Under this component of the *Barker-*

---

[6] Subsequent to the trial court's orders being entered, the Georgia Supreme Court decided *Johnson v. State*, 315 Ga. 876 (885 SE2d 725) (2023) which held that trial courts have the authority, but not the obligation, to recognize a filing by a represented individual who is formally represented by counsel at the time of filing. "Given the logistical and legal problems hybrid representation can cause, we expect that courts will exercise this discretion only rarely, as when trial counsel has failed to act within the prescribed time period to preserve the defendant's right to appeal and a pro se filing would preserve that right. And when a court chooses to recognize such a filing, it should make that exercise of discretion clear on the record." *Johnson*, 315 Ga. at 877. However, *Johnson* does not mandate that trial judges always recognize documents filed by represented individuals, only that they have the authority to do so when appropriate.

[7] The motion for a statutory speedy trial was filed on July 2, 2020.

*Doggett* analysis, the question is not only whether appellant asserted his right to a speedy trial, the question also involves "a close examination of the procedural history of the case with particular attention to the timing, form, and vigor of the accused's demands to be tried immediately." *Cash v. State*, 307 Ga. 510, 517 (2) (b) (iii) (837 SE2d 280) (2019) (citation omitted).

Appellant did not present a valid demand for a speedy trial until April 20, 2020, more than one year after his indictment. He never filed a valid demand for a speedy trial under OCGA § 17-7-170. "Our cases hold that an extended delay in asserting the right to a speedy trial should normally be weighed *heavily* against the defendant." *Cash*, 307 Ga. at 517 (citations omitted) (emphasis in original). However, under the unique facts of this case, we find that the delay in asserting a valid demand should only be weighed lightly against appellant. The trial court found that one of appellant's primary motivations in seeking to have his initial appointed counsel dismissed was his desire to pursue a motion to dismiss based upon a violation of his speedy trial rights which counsel elected not to file. Almost immediately upon becoming self-represented, he asserted his rights in this regard. However, that filing was not made until more than one year had passed from his indictment. "'A defendant may assert

his constitutional right to a speedy trial at any time after he is arrested' and 'need not wait until indictment.'" *Cash*, 307 Ga. at 517 (citation omitted). Therefore, we find that this factor should be weighed against appellant, but only lightly.

### iii. Prejudice

Finally, the *Barker-Doggett* analysis requires us to examine and weigh any prejudice caused by the delay in the proceedings. "The fourth *Barker* factor involves three interests that the speedy trial right was designed to protect: (i) preventing oppressive pretrial incarceration; (ii) minimizing anxiety and concern of the accused; and (iii) limiting the possibility that the defense will be impaired." *Myers v. State*, 370 Ga. App. 643, 648 (2) (b) (iv) (898 SE2d 834) (2024) (citation omitted) . "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Labbe*, 362 Ga. App. at 570 (citation and punctuation omitted).

In this case, there are no allegations of oppressive pretrial detention as that phrase is understood in this context. Appellant noted in his briefing that the trial court did not make an express finding relating to oppressive pretrial detention and, without explanation, summarized that this factor should be weighed heavily against the State.

However, appellant failed to identify any facts within the record to suggest that appellant's incarceration was sought and maintained with the intent to oppress appellant or any aspect of his defense.

In the context of the *Barker-Doggett* analysis, "[a]nxiety and concern of the accused are always present to some extent, and thus absent some unusual showing are not likely to be determinative in defendant's favor." *Myers*, 370 Ga. App. at 648 (citation omitted). The trial court found that appellant's anxiety and concern was "no worse than any other inmate at the jail." There has been no evidence or argument presented to suggest that appellant's anxiety or concern was unusual or extreme or that the trial court abused its discretion in reaching this conclusion.

The most important interest under the prejudice factor to be considered when examining prejudice is any impairment of the accused's defense. *Harrison v. State*, 311 Ga. App. 787, 794 (3) (d) (iii) (717 SE2d 303) (2011).

> The weight given to the prejudice factor may bebolstered if the defendant can demonstrate some actual impairment to his defense in addition to prejudice that is presumed from the passage of time. Likewise, the weight given to presumed prejudice may be reduced or even eliminated if the State can show that the defense has not, in fact, been substantially impaired.

*State v. Porter*, 288 Ga. 524, 532 (2) (d) (705 SE2d 636) (2011). Appellant has not identified any evidence in the record to establish that his defense was actually impaired by the delay. The trial court found "[t]here is no evidence that supports a finding that the testimony of witnesses has been adversely impacted or for any reason evidence will not be available for use at trial." We find no error in the trial court's conclusions in this regard.

### iv. *Balancing the Barker-Doggett factors*

In *Barker*, the United States Supreme Court explained

> We regard none of the four factors . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Barker*, 407 U.S. at 533. This direction was cited with approval by the Georgia Supreme Court in *Porter*. *Porter*, 288 Ga. at 532-533. In performing this delicate and fact-intensive balancing test, we find that appellant's constitutional right to a speedy trial has not been denied or diminished under the facts of this case. While there was a delay in the proceedings which triggered the presumption of prejudice, the

24

remaining facts of the case do not support a finding that appellant's constitutional speedy trial rights have been violated. The trial court assessed the facts, properly considered each of the applicable factors and denied appellant's motions which were based on constitutional speedy trial principles. We therefore affirm the trial court's exercise of its discretion in denying the motion for discharge and acquittal on constitutional speedy trial grounds.

### III. Ineffective assistance of counsel

Appellant claims that he received ineffective assistance of counsel during his trial. Specifically, appellant complains on appeal that after trial counsel filed an alibi notice in advance of trial, the alibi witness was not called to testify at trial. During the hearing on appellant's motion for new trial, trial counsel testified as did the purported alibi witness.

To prevail on an ineffective assistance of counsel claim, a defendant must prove both that his trial counsel's performance was deficient and that he was prejudiced by this deficient performance. *Bonner v. State*, 314 Ga. 472, 474 (1) (877 SE2d 588) (2022) (citing *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022));

*Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LEd2d 674) (1984). "To establish prejudice, [appellant] must show that 'but for such deficient performance there is a reasonable probability that the result of the trial would have been different.'" *Tumlin v. State*, 356 Ga. App. 461, 463 (1) (847 SE2d 637) (2020) (citation omitted). "This burden, although not impossible to carry, is a heavy one." *Young v. State*, 292 Ga. 443, 445 (3) (738 SE2d 575) (2013) (citation omitted). "If the appellant fails to meet his burden on one prong of this test, we need not address the other prong. In addition, a strong presumption exists that trial counsel performed within the wide range of reasonable professional assistance." *Wilcox v. State*, 309 Ga. App. 538, 539 (2) (711 SE2d 67) (2011) (citation and punctuation omitted).

> An appellate court evaluates counsel's performance from counsel's perspective at the time of trial. In other words, "hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no significance for an ineffective assistance of counsel claim."

*Easley v. State*, 352 Ga. App. 1, 9 (3) (833 SE2d 591) (2019) (citation and punctuation omitted).

A trial court's finding of effectiveness must be upheld unless clearly erroneous. *Covington v. State*, 251 Ga. App. 849, 852 (555 SE2d 204) (2001) (citation and punctuation omitted). "In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo." *Tumlin*, 356 Ga. App. at 463 (citation omitted). With these principles in mind, we turn to appellant's arguments.

Trial counsel filed an alibi notice, indicating that on the date and time the offenses were committed, appellant was not located within the county where the offenses occurred and that his whereabouts would be verified by a witness, V. S. . V. S. was appellant's former landlord and testified that she was with appellant on the date of the crime until approximately midnight at her home in Atlanta. She testified that she and appellant were watching a specific television show on that evening.

After speaking with V. S. prior to trial, counsel sent her a subpoena and remained in contact with the witness to ensure that V. S. knew when she was expected to testify.[8] Trial counsel also paid for a ride service to pick V. S. up and transport her

---

[8] V. S. denied receiving the subpoena but did acknowledge regular telephone contact with counsel about her appearance at trial.

to court on the day she was to testify. As counsel drove to court on the last day of trial, she received a call from V. S. during which V. S. claimed that she was ill and would not be coming to testify. V. S. testified that she "might" have told counsel's administrative assistant that she was not willing to testify. The witness was hostile with counsel during the call and, given V. S.'s tone and the content of the conversation, counsel was concerned whether the witness was being candid about her condition. In advance of trial, but after counsel filed the alibi notice, counsel received a supplemental discovery response from the State which included recordings of telephone calls that appellant had with V. S. while appellant was incarcerated. There was a significant disparity between what V. S. had told counsel and what was contained on those recorded calls. Counsel was aware that the State would use the recorded telephone calls to impeach V. S. if the witness did testify. The content of those calls, combined with V. S.'s sudden unavailability, made counsel extremely uneasy and caused counsel to question V. S.'s credibility. In the final analysis, counsel did not request a continuance because, as an officer of the court, counsel could not make a good faith representation whether the claim of sudden illness was true or not.

As a matter of trial strategy, trial counsel testified that even if V. S. had appeared as scheduled, counsel may not have called her as a witness. Counsel had filed an alibi notice but alibi was not the sole defense or even the primary defense being presented.

We conclude, as did the trial court, that trial counsel did not provide ineffective assistance to appellant in this case. Counsel's decision to forego testimony that would have not been helpful - and could have even proved harmful - to appellant's defense was a matter of reasonable trial strategy. See *McKelvey v. State*, 311 Ga. 34, 44 (5) (855 SE2d 598) (2021). Because appellant has not overcome the strong presumption that trial counsel's conduct fell within the broad range of acceptable professional conduct, this enumeration of error is also meritless. It is well-established that a decision as to which defense witness to call at trial or whether to call any such witnesses is a "matter of counsel's trial strategy and will not support a claim for ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." *Smith v. State*, 371 Ga. App. 740, 745 (3) (903 SE2d 135) (2024) (citation omitted). That burden has not been carried by appellant under these facts.

Because appellant has failed to establish deficient conduct, we need not reach the issue of prejudice. *Wilcox v. State*, 309 Ga. App. 538, 539 (2) (711 SE2d 67) (2011) (citation and punctuation omitted).

*Judgment affirmed. Dillard, P. J., and Brown, J., concur.*